UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

Paul Haslam,                    )
        Plaintiff              )
                               )
        v.                     )          Civil No. 1:07-cv-52-SJM
                               )
MVM, Inc.,                     )
        Defendant              )

## **O R D E R**

Paul Haslam has sued his former employer, MVM, Inc. ("MVM"), for discrimination and retaliation under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.[1]  Defendant moves for summary judgment.  Plaintiff objects.  As discussed below, defendant's motion for summary judgment is necessarily granted.

## **Summary Judgment Standard**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila

---

[1] Plaintiff originally asserted, but has since withdrawn, claims under the Rehabilitation Act.

v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12
(1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386
F.3d 5, 7 (1st Cir. 2004)).

     To defeat a motion for summary judgment, "the non-moving
party 'must set forth specific facts showing that a genuine issue
of material fact exists as to each issue upon which [he] would
bear the ultimate burden of proof at trial.'" Torres-Negron v.
Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007) (quoting Santiago-
Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st
Cir. 2000)).  To make that showing, "the non-moving party may not
rest merely upon the allegations or denials in its pleading."
Id. (citation omitted).  When ruling on a party's motion for
summary judgment, the court must view the facts in the light most
favorable to the nonmoving party and draw all reasonable
inferences in that party's favor.  See id. (citing Rodríguez v.
SmithKline Beecham, 224 F.3d 1, 5 (1st Cir. 2000)).


                            **Background**

     From December, 1996, until late November, 2005, MVM employed
Paul Haslam as a court security officer ("CSO") at the federal
courthouse in Bangor, Maine.  MVM provided security services for
the Bangor courthouse under a contract with the United States
Marshals Service ("USMS").

                               2

MVM's contract requires each CSO employed by MVM to undergo an annual physical examination, the results of which are reviewed by a USMS physician, who determines whether the CSO is medically qualified to work.  As a part of the process, the USMS physician may request additional information.  The contract also provides:

> All requests from the USMS Medical Officer for additional information must be responded to within thirty days from the date of the request, unless a specific written extension is authorized by Judicial Protective Services.  Failure to provide the requested information to the USMS Medical Officer could result in a determination of medical disqualification.

If the USMS determines that a CSO is medically disqualified for failure to provide requested information, the USMS contracting officer notifies MVM of the disqualification and directs MVM to immediately relieve the CSO from performance of duty under the contract.  Moreover, after MVM has been notified of a CSO's medical disqualification, MVM cannot continue to employ the CSO under the contract.  If MVM does not remove a medically disqualified CSO from the contract, the USMS will not pay MVM for the hours of work performed by the disqualified CSO.

On July 20, 2004, Haslam had his annual physical examination.  On August 24, Marc Farmer of the USMS Judicial Security Division sent MVM a letter which stated:

3

Our office has received and reviewed the
Certificate of Medical Examination of [Haslam].  The
following information is missing or incomplete and must
be completed before medical qualification can be
determined by the USMS Medical Officer:

Page 2:   CSO must indicate reason/diagnosis for
taking the following medication: <u>Lexapro</u>

Page 3:   CSO indicated a negative cardiac history
on page 3.  The examining physician
noted "History of A-fib" on page 3.  CSO
must amend his answer on page 3 to
include this past history.

Haslam provided a written response in which he explained his use

of Lexapro, and he transmitted various medical records pertaining

to his atrial fibrillation, which was first diagnosed in 1998.


On October 26, 2004, the USMS's Judicial Security Division's

Reviewing Physician, Dr. Chelton, completed a "medical review

form" on which he reported Haslam's status to be "Medical

determination deferred pending further documentation."  More

specifically, Dr. Chelton wrote:


<u>Incumbent has medical findings which may hinder safe
and efficient performance of essential job functions.
Please provide the following detailed or diagnostic
medical information.  Per agency request, if further
information is not provided, a determination will be
made based on available medical information.  Send
medical information to your employer</u>.[2]

---

[2] This language, which appears to be boilerplate, appears in
each of five subsequent deferrals that Dr. Chelton issued in
Haslam's case.

4

You reported a history of taking Lexapro.  Have your providing physician provide a detailed report regarding the medical condition that requires this medication, including its history, present symptoms, control, medication side effects, and whether you have any limitations of activity (physical or mental) and any contraindications for vigorous intensity physical exercise.

Please have your cardiologist provide a report discussing the indications and contraindications for the use of Coumadin in the context of your atrial fibrillation condition.

In response, Haslam provided some information,[3] but not enough to satisfy Dr. Chelton, who, on December 17, 2004, deferred his medical determination for a second time, writing:

Thank you for providing the requested information.  The condition of atrial fibrillation is associated with an increased risk of stroke.  This risk is commonly reduced by ongoing use of an anticoagulant medication. It is important that we establish that the CSO's atrial fibrillation condition is being appropriately monitored by a cardiologist who has made a conscious decision not to institute such treatment.  It is also important that we understand what factors that have led the cardiologist to forego such treatment.  Please provide a CARDIOLOGIST'S report addressing these issues.  The prior request is copied below for your convenience:

Haslam responded by submitting a report from a new-patient consultation with Dr. Wolfgang Spyra, a cardiologist, that included the following:

---

[3] The record does not appear to include the information Haslam provided in response to the October 26 request.  Plaintiff does not contend that he submitted a cardiologist's report.

5

> I have talked today with Dr. Hanlon [Haslam's primary
> care physician] and later with the patient about blood
> pressures.  His BPs were mildly elevated.  I informed
> the patient that his stroke risk is about 2-3% without
> the drug if he has HTN and [indecipherable].  To make
> this diagnosis, serial measurements would be required.
> Dr. Hanlon measured 118/95 on [indecipherable].  Being
> on coumadin could be harmful if the patient is attacked
> on the job and suffers a bleeding cranial injury.  I
> informed the patient and Dr. Hanlon about these
> possibilities.  She will follow the patient's blood
> pressure and then decide with Mr. Haslam.

On June 6, 2005, Chelton issued a third medical review form on

which he deferred Haslam's medical determination pending further

documentation.  Regarding the necessary further documentation,

Dr. Chelton wrote:

> Thank you for providing the requested information.
> Review of these records indicates that the cardiologist
> has deferred the decision to treat the CSO with
> Coumadin to Dr. Hanlon.  Please have Dr. Hanlon provide
> a report responding to the issues in our previous
> request.  That request is restated below for your
> convenience:

In response to Dr. Chelton's third request for documentation,

Haslam submitted the same report from Dr. Spyra he had previously

submitted in response to Dr. Chelton's second request, along with

a letter indicating that he had an appointment scheduled with Dr.

Spyra for July 1, 2005.  On July 24, Dr. Chelton deferred

Haslam's medical determination for a fourth time, writing:

> I have received additional medical records from
> Northeast Cardiology associates.  However, these
> records do not include any discussion of the decision

> to forgo anticoagulation in this CSO with atrial
> [fibrillation].  The review can not be completed until
> this information is received and reviewed.  Failure to
> provide this information may result in medical
> disqualification.  The prior request is copied below
> for your convenience.  Please provide this information
> within the specified response period.

In response to Dr. Chelton's fourth request for documentation,

Haslam submitted a letter from Donna Cotton, his family nurse

practitioner, which referred to statements made by Dr. Spyra and

Dr. Hanlon.  On August 25, Dr. Chelton deferred Haslam's medical

determination for a fifth time, writing:

> I have received a letter dated 07/07/2005 from the
> CSO's family nurse practitioner.  This letter makes
> reference to statements by the CSO's cardiologist, Dr.
> Spyra, regarding the decision not to prescribe
> Coumadin.  In order to complete the review, we must
> have copies of the documents from Dr. Spyra of
> 01/07/2005 and 07/01/2005 referred to in the letter or
> a new report from Dr. Spyra regarding this issue.  We
> cannot accept the nurse practitioner's summary of those
> communications.

> This is the FIFTH REQUEST for this information.  The
> first request was made on 10/26/2004, the second on
> 12/17/2004, the third on 06/06/2005, and the fourth on
> 7/24/2005.  NO FURTHER REQUESTS WILL BE MADE FOR THIS
> INFORMATION.  FAILURE TO PROVIDE THIS INFORMATION
> WITHIN THE SPECIFIED RESPONSE PERIOD MAY RESULT IN
> MEDICAL DISQUALIFICATION.  The requested information
> must come from a CARDIOLOGIST and must specifically
> indicate the rationale for avoiding Coumadin therapy in
> this individual with chronic atrial fibrillation.  The
> previous request is copied below for your convenience:

In response, Haslam re-submitted the July 7 letter from Donna Cotton along with a report from Dr. Spyra that included the following:

> When I saw [Haslam] firstly on 1/25/05 he was in atrial fibrillation and blood pressure was 134/100 and 130/98 mmHg.  We talked about atrial fibrillation in the presence of hypertension and that coumadin would be recommended in this situation.  I also told him in January that I cannot make the diagnosis of HTN since I did not have serial past measurements to base a diagnosis on.  A single measurement would not suffice to make the diagnosis.  I therefore referred this issue to Dr. Hanlon who had seen him in the past and had talked with her.
>
> . . . .
>
> 1. I informed the patient that AF in the presence of HTN requires coumadin intake for stroke prevention based on current guidelines.
>
> 2. I also informed Mr. Haslam that I do not [have the necessary] information to make the diagnosis of HTN and it would be best if he [asks] his primary care provider to follow his pressures over the next weeks.  I also proposed that he gets the blood pressure measurements of the last 1-2 years from Dr. Hanlon's office and from his personal professional files.  If these document elevated blood pressures, coumadin would be indicated.

Haslam also submitted a letter from Dr. Alisa Roberts indicating that she had started him on Coumadin.

On September 7, 2005, the USMS contracting officer, Lauris Eek, sent MVM a letter which stated, in pertinent part:

> I have received notification from the US Marshals Service Judicial Protective Services Program Office,

that one of your employees, CSO Paul D. Haslam,
District of Maine, has failed to submit the required
medical information which was requested by the U.S.
Public Health Officer on October 26, 2004; December 17,
2004; June 6, 2005; July 24, 2005; and August 25, 2005.
Paul D. Haslam is therefore medically disqualified from
the CSO/SSO program.

Please remove this individual immediately from
performance under this contract and submit a
replacement package in accordance with the contract
terms and conditions.  The CSO must relinquish all
government furnished property to the cognizant
Contracting Officer Technical Representative (COTR) in
the District.  If the individual is kept on the
contract in contravention of this letter, the USMS will
not pay for the individual's hours of work.

The day MVM received the letter from the USMS, Jim Dolan of MVM

showed it to Haslam.


Later that day, Haslam contacted the office of United States

Senator Susan Collins and complained about being terminated from

his position as a CSO.  Specifically, he told staffers Michael

Noyes and John Ford about the "very, very convoluted system for

determining physical ability to do the job" and that

they[4] perceived me as being disabled and unable to do
my duties because of my heart condition and that no
matter what I did to supply medical information, it was
never enough.  Five . . . I believe five requests took
seven months dealing with Dr. Chelton.  If I'm not
mistaken, if we review the documents, five requests and
responses took seven months.  And I told them that I

---

[4] By "they," Haslam meant "[e]verybody involved" in the
decision to suspend him.

9

felt I was terminated because of my heart condition
because I couldn't comply with medical requests.[5]

Subsequently, Noyes contacted Dolan and told him that "Senator
Collins was very upset that [Dolan] had fired a United States
Marshal with 11 years of outstanding service and that [Dolan] was
going to feel the full wrath of [Senator Collins'] office."
Plaintiff has identified no evidence suggesting that Noyes told
Dolan that he, Haslam, had complained to Senator Collins about
disability discrimination.  Nor has he identified any evidence to
suggest that he ever told anyone at the USMS or MVM that he
thought he had been suspended because he was regarded as
disabled.

On October 19, 2005, after the termination letter from the
USMS to MVM was shown to Haslam, Dr. Chelton once again deferred
his medical determination pending further documentation, writing:

Thank you for providing the records documenting that
the CSO has been placed on Coumadin, which was
acceptable.  Please also have the treating physician
provide a report that addresses the following:

---

[5] While it does not appear that the following statement from
Haslam's deposition was something he told Senator Collins'
staffers, it sheds useful light on his claim: "I was terminated
because I was being accused of not submitting medical request
responses to my atrial fibrillation.  Therefore, it caused the
perception that I was unable to do my job because I – I had some
type of disability."

10

a. a copy of all labs taken since the onset of treatment, including all measurements of PT/INR and any other tests for coagulation status;

c. a copy of ALL outpatient clinic notes since the onset of treatment with a discussion of all episodes of abnormal bleeding.

e. the risk of bleeding with blunt or penetrating trauma, as compared to individuals not taking anti-coagulant medication (if unable to quantify risk, please state the risk is "low", "medium", or "high"); and

f. whether there are any contraindications or recommended limitations for vigorous intensity physical activity and physically confrontational situations where there is a likelihood of blunt or penetrating trauma.

Please ask the physician to specifically address each of the items above in the requested report.  Incomplete reports will be returned for completion.

The day after Dr. Chelton issued that review form, the USMS contracting officer informed MVM that "[p]ursuant to a review of recently submitted medical information and additional consultation with the U.S. Public Health Officer, Mr. Haslam has been determined to be eligible to be reconsidered as a CSO."  The contracting officer elaborated:

[T]he medical disqualification of September 7, 2005 is rescinded and the final medical review and approval deferred pending further documentation.  Mr. Haslam should continue under his previous removal from duty, nor participate in Court Security Officer activities, pending the receipt and review of ALL the requested information noted on the attached medical review form. Once the required information is received, the medical review process will be expedited to quickly resolve Mr. Haslam's medical status.

11

Haslam provided additional medical information on November 6, 2005, and on November 14, Dr. Chelton determined Haslam's status to be "Medically qualified."  Four days later, the USMS contracting officer wrote to MVM, reporting that "the U.S. Public Health Service, Medical Review Officer, has determined that CSO Haslam can safely perform all the contractually required duties of a CSO and may return to work."

Three days after that, Dolan received the following e-mail from Thomas Folan of the USMS:

> I have received a letter from Mr. Lauris Eek, contracting officer for the USMS/MVM contract, informing me that Paul Haslam can return to full duty status immediately.  I would like you to speak to Mr. Haslam about the following contract violations observed or reported to me over the past few months.  It should also be noted that Mr. Haslam's appearance and dress is outstanding [but] his attitude and working relationship with the court staff and co-workers is at times very unprofessional.  I feel that this has been detrimental to the security and the working environment at the courthouse.  A clear difference has been observed by me and the USMS/CSO staff since his removal on September 9, 2005.  This and the following items should be discussed with Mr. Haslam.
>
> 1.   Use of personal computer at courthouse, and performing work related to other employment.
>
> 2.   Use of cell phone at courthouse and use of it to perform work related to other employment.
>
> 3.   Carrying a personal[ly] owned weapon to and from courthouse and storage of it at courthouse.

4.   Personal use of government equipment for personal
     use i.e. Fax, phone, and copy machine.

On November 28, Dolan telephoned Haslam and told him that he was
cleared to return to work, and was expected at work on November
30.  Dolan also read Haslam the e-mail from Folan, and told
Haslam that when he returned, he would be required to sign a
document acknowledging that Dolan had spoken with him about
Folan's concerns.  Dolan telephoned Haslam the next day and asked
if he intended to return to work.  Haslam said he was not coming
back.  Dolan followed up with a letter to Haslam informing him
that "if [he] fail[ed] to return to work, it will be considered
an unauthorized absence and could result in disciplinary action
up to and including termination."  Haslam did not report for duty
on November 30, and never returned to work as a CSO.  MVM offered
Haslam a job performing outside security at the federal
courthouse in Bangor, but he declined the offer.


                           **Discussion**

<u>1. Discrimination</u>

    Haslam claims that MVM discriminated against him, in
violation of 42 U.S.C. § 12112(a), by removing him from duty on
September 7, 2005, at the direction of the USMS, based upon the
USMS's perception of him as disabled due to an atrial
fibrillation condition.  Defendant moves for summary judgment on

                               13

Haslam's discrimination claim, arguing that: (1) plaintiff has not established a prima facie case of disability discrimination because he has not shown that MVM regarded him as having an impairment; and (2) even if plaintiff has established a prima facie case, he cannot prove that MVM's reason for suspending him was a pretext for disability discrimination.  Plaintiff counters that: (1) the record establishes that MVM regarded him as disabled by atrial fibrillation; and (2) summary judgment is precluded by the existence of a genuine issue of material fact, i.e., whether MVM's explanation that Haslam did not properly respond to Dr. Chelton's requests for medical information was a pretext for the directive to remove him from duty as a CSO due to the ongoing diagnosis of atrial fibrillation.

The Americans With Disabilities Act provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Under the Act, "[t]he term 'disability' means, with respect to an individual– (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded

14

as having such an impairment." 42 U.S.C. § 12102(2). Here, plaintiff claims he is a qualified individual with a disability because MVM regarded him as having a physical impairment – his cardiac condition – that substantially limited one or more of his major life activities.

In the absence of direct evidence, ADA discrimination claims are subject to "the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007) (citations omitted). Under that framework:

> If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005). If the defendant offers a legitimate, non-discriminatory reason, the initial inference of discrimination evaporates, Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991), and the burden then shifts back to the plaintiff to "proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus," Tobin, 433 F.3d at 105. The employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Dichner [v. Liberty Travel], 141 F.3d [24,] 30 [(1st Cir. 1998)].

15

Freadman, 484 F.3d at 99–100 (footnote and parallel citations
omitted).  "To establish a prima facie case of disability
discrimination under the ADA, a plaintiff must prove: (1) that
[he] was 'disabled' within the meaning of the ADA; (2) that [he]
was able to perform the essential functions of [his] job with or
without accommodation; and (3) that [he] was discharged or
adversely affected, in whole or in part, because of [his]
disability."  Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 82
(1st Cir. 2008) (citing Katz v. City Metal Co., 87 F.3d 26, 30
(1st Cir. 1996); Orta-Castro v. Merck, Sharp & Dohme Química
P.R., Inc., 447 F.3d 105, 111 (1st Cir. 2006)).


     While the showing necessary to establish a prima facie case
of disability discrimination is "easily made," Gillen v. Fallon
Ambulance Serv., Inc., 283 F.3d 11, 30 (1st Cir. 2002), defendant
is correct here — plaintiff has failed to establish a prima facie
case.  For plaintiff to survive summary judgment, he must
establish that notwithstanding his ability to perform the
essential functions of the his job, MVM regarded him as disabled
and treated him adversely based upon that perception.

          Regarded as claims primarily fall into one of two
     categories: "(1) a covered entity mistakenly believes
     that a person has a physical impairment that
     substantially limits one or more major life activities,
     or (2) a covered entity mistakenly believes that an

                              16

actual, nonlimiting impairment substantially limits one
or more major life activities." Sullivan [v. Neiman
Marcus Group, Inc.], 358 F.3d [110,] 117 [(1st Cir.
2004)] (citing Sutton v. United Air Lines, Inc., 527
U.S. 471, 489 (1999)).

Ruiz Rivera, 521 F.3d at 83 (parallel citations omitted).[6]

        Plaintiff does not claim that MVM regarded him as disabled.

He argues, instead, that "the record evidence establishes that

USMS, and by extension, MVM, regarded [him] as disabled due to a

cardiac disability associated with atrial fibrillation."  The

record evidence, however, includes nothing tending to establish

that anyone associated with the USMS or MVM ever regarded

plaintiff as physically incapable of performing CSO work, much

less that anyone regarded him as disabled within the meaning of

the ADA.[7]  Of the seven medical review forms Dr. Chelton filled

_____

        [6] The court further explained the purpose of the ADA's
"regarded as" language:

        The regarded as prong of the ADA exists to cover those
        cases "in which 'myths, fears and stereotypes' affect
        the employer's treatment of an individual," Plant v.
        Morton Int'l, Inc., 212 F.3d 929, 938 (6th Cir. 2000)
        (quoting 29 C.F.R. § 1630.2(l)), because Congress has
        recognized that "society's accumulated myths and fears
        about disability and disease are as handicapping as are
        the physical limitations that flow from actual
        impairment."  Sullivan v. Neiman Marcus Group, Inc.,
        358 F.3d 110, 117 (1st Cir. 2004) (citations omitted).

Ruiz Rivera, 521 F.3d at 82-83.

        [7] As the regulations implementing the ADA explain, "[t]he
inability to perform a single, particular job does not constitute

out between October 26, 2004, and November 14, 2005, only the last one drew any medical conclusion, and on that form, Dr. Chelton determined that plaintiff <u>was</u> medically qualified, notwithstanding his atrial fibrillation condition.  The September 7, 2005, letter from Lauris Eek to MVM did not characterize Haslam's medical condition in any way but, rather, indicated that he had been determined to be medically disqualified for an administrative reason: his failure to provide the precise medical information from a qualified source that Dr. Chelton requested. It is also undisputed that no one from MVM ever indicated that he or she thought plaintiff was physically incapable of performing his CSO duties, or made comments of any sort to plaintiff regarding his physical or medical condition.  Even viewing the evidence in the light most favorable to plaintiff, it is not reasonable to infer from Dr. Chelton's repeated requests for precise information from a qualified source, or from Eek's letter to MVM, that Dr. Chelton, the USMS, or MVM regarded plaintiff as disabled.

Because there is no evidence that MVM, either on its own or at the direction of the USMS, regarded plaintiff as having an impairment, he has failed to establish a prima facie case of

---

a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I); <u>see also</u> <u>Sutton</u>, 527 U.S. at 493.

disability discrimination.  That failure entitles defendant to
summary judgment on the discrimination claim.  Moreover, even if
plaintiff had established a prima facie case, he has produced no
evidence tending to show that MVM's proffered reason for
suspending him, i.e., its contractual obligation to follow the
USMS's directive to take that action, was a pretext cloaking
discriminatory animus.

     "In assessing pretext, the court must look at the total
package of proof offered by the plaintiff."  Tobin, 433 F.3d at
105 (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174 (1st
Cir. 2003)).  To show pretext, plaintiff first must "refute the
clear evidence put forward by [MVM] showing that it was [his
failure to provide requested medical information], and not
disability, that constituted the real reason for [the September 7
suspension]."  Tobin, 433 F.3d at 105.  Then,

> he must advance evidence of his own showing that
> [MVM]'s asserted reason was a pretext hiding
> discrimination.  See Mesnick v. Gen. Elec. Co., 950
> F.2d 816, 824 (1st Cir. 1991) (stating that "[i]t is
> not enough for a plaintiff merely to impugn the
> veracity of the employer's justification; he must
> elucidate specific facts which would enable a jury to
> find that the reason given is not only a sham, but a
> sham intended to cover up the employer's real motive"
> (internal quotations omitted)).

Id.

Here, plaintiff has done nothing to refute the evidence showing that he was suspended on September 7 for failing to provide the medical information Dr. Chelton requested. Indeed, the record discloses a clear pattern of Dr. Chelton asking for precise medical information from a described qualified medical source, and Haslam responding by providing something different. Nor has plaintiff produced any evidence or identified any specific facts in the record that would permit a reasonable jury to find that the reason given for his suspension was not only a sham, but a sham intended to cover up disability discrimination.

There can be little doubt that plaintiff was personally frustrated by the seemingly bureaucratic focus on excessive detail in resolving the nature of his medical condition and associated risks. But, there is nothing in the record to suggest that Dr. Chelton was motivated by anything other than a legitimate interest in collecting sufficiently detailed information, from a qualified medical source, on which to base his own medical determination. Likewise, no evidence suggests that the USMS directed MVM to remove plaintiff from the contract for any reason other than his failure to provide the requested medical information. And, no evidence suggests that MVM suspended plaintiff for any reason other than the directive from the USMS to do so, and its contractual obligation to comply.

20

Finally, plaintiff has produced no evidence of disability-based animus on the part of anyone involved in the decision to suspend him, from Dr. Chelton to Lauris Eek to Jim Dolan.[8]  Accordingly, plaintiff has failed to produce sufficient evidence to create a triable issue of pretext.

### 2. Retaliation

Haslam also claims that MVM retaliated against him for complaining to Senator Collins, in violation of 42 U.S.C. §§ 12203(a) and (b), by: (1) demanding that he acknowledge in writing that he had violated various performance standards;[9] and (2) terminating him for refusing to report to work and submit to discipline.  Defendant moves for summary judgment, arguing that plaintiff has not established a prima facie case of retaliation because he has no evidence that MVM was aware that he engaged in

---

[8] There is some evidence that lead CSO Mike Ayer was antagonistic toward plaintiff, but there is no evidence that Ayer's animus was disability-related.

[9] While plaintiff's objection to summary judgment says that MVM retaliated against him by informing him that he "would have to acknowledge in writing that he had violated several performance standards," his own statement of material facts says only that "Mr. Dolan was expected to discuss with Mr. Haslam several alleged violations of the code of conduct" and that "Mr. Dolan . . . intended to ask Mr. Haslam to sign documents to indicate that he understood that he had been counseled on these issues."  While there is record support for the proposition that Dolan intended to require Haslam to acknowledge that he had been told about several concerns regarding his performance, there is no record support for the proposition that Dolan intended to compel Haslam to admit to violating the code of conduct.

protected conduct and because he cannot demonstrate a causal connection between his protected conduct and any adverse action taken against him.  Defendant further argues that even if plaintiff has established a prima facie case, he cannot prove that MVM's proffered reasons for the allegedly retaliatory acts were pretextual.  Plaintiff counters that: (1) defendant's knowledge of his protected conduct, and the necessary causal connection between that conduct and the employment actions taken against him, is shown by the quick turn-around in the USMS's position after Senator Collins' office interceded on his behalf; and (2) pretext is shown by the fact that the USMS and MVM tolerated conduct by other CSOs that was much worse than the conduct for which Dolan intended to discipline him.

With regard to retaliation, the Americans With Disabilities Act provides, in pertinent part:

**(a) Retaliation**

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

**(b) Interference, coercion, or intimidation**

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her

22

having exercised or enjoyed, or on account of his or
her having aided or encouraged any other individual in
the exercise or enjoyment of, any right granted or
protected by this chapter.

42 U.S.C. § 12203.  As with ADA discrimination claims, ADA
retaliation claims are subject to the McDonnell Douglas burden-
shifting analysis.  See Cruz v. McAllister Bros., Inc., 52 F.
Supp. 2d 269, 286 (D.P.R. 1999) (citing Soileau v. Guilford of
Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)).  "To establish a
claim of retaliation, a plaintiff must show that (1) [he] engaged
in protected conduct, (2) [he] suffered an adverse employment
action, and (3) there was a causal connection between the
protected conduct and the adverse employment action." Freadman,
484 F.3d at 106 (citing Wright v. CompUSA, Inc., 352 F.3d 472,
478 (1st Cir. 2003)).


     In addition to the three elements set out in Freadman, a
retaliation plaintiff must also show that his or her employer was
aware of the protected conduct.  Some authorities consider that
showing to be part of the first element of the prima facie case.
See, e.g., King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir.
1997) (citing Hoeppner v. Crotched Mtn. Rehab. Ctr., 31 F.3d 9,
14 (1st Cir. 1994); Petitti v. N.E. Tel. & Tel. Co., 909 F.2d 28,
33 (1st Cir. 1990)).  Other authorities treat the showing of
employer knowledge as part of the third element.  See, e.g.,

23

<u>Pomales v. Celulares Telefonica, Inc.</u>, 447 F.3d 79, 85 (1st Cir. 2006) (footnote omitted).  The rationale is that an employer's action cannot be caused by something the employer does not know about.  Regarding employer knowledge of protected conduct in the context of the causation element, the court of appeals for this circuit has explained:

> Temporal proximity can create an inference of causation in the proper case.  <u>See</u> <u>Wyatt v. Boston</u>, 35 F.3d 13, 16 (1st Cir. 1994).  But to draw such an inference, there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action.  <u>See</u> <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 16–17 (1st Cir. 1997).

<u>Pomales</u>, 447 F.3d at 85 (citing <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 533–34 (10th Cir. 1998) (holding that the plaintiff failed to establish a prima facie case of retaliation because there was no evidence that the decisionmaker knew of the plaintiff's protected conduct); <u>Smith v. Riceland Foods, Inc.</u>, 151 F.3d 813, 818–19 (8th Cir. 1998) (same)); <u>see also</u> <u>Mesnick</u>, 950 F.2d at 827 (explaining that plaintiff's prima facie case includes showing "that the employer knew of the plaintiff's [protected] conduct").

Assuming that Haslam engaged in protected conduct, <u>i.e.</u>, seeking assistance from Senator Collins and complaining to her

office about alleged disability discrimination, and assuming
further that MVM subsequently took adverse employment actions
against him, plaintiff still has failed to establish a prima
facie case of retaliation because he has failed to produce
evidence or point to facts showing, or from which it could be
reasonably inferred, that anyone at the USMS or MVM knew that he
had engaged in protected conduct.

Plaintiff has produced evidence suggesting that various
employees of the USMS and MVM knew he had gone to Senator
Collins' office to complain about his suspension. But, he has
produced no evidence showing that anyone at the USMS or MVM knew,
or had reason to think, that he had complained to Senator Collins
about disability discrimination, which is the conduct protected
by the anti-retaliation provisions of the ADA. See Fiumara v.
President & Fellows of Harvard Coll., 526 F. Supp. 2d 150, 158-59
(D. Mass. 2007) (holding that pre-termination complaints about
matters other than alleged disability discrimination were not
protected conduct under state anti-retaliation statute); Stinson
v. Simplexgrinnel LP, 394 F. Supp. 2d 280 (D. Me. 2005) (granting
motion to dismiss retaliation claim when plaintiff alleged that
she complained to employer about hostile work environment, but
not sexually hostile work environment); see also Albrechtsen v.
Bd. of Regents, 309 F.3d 433, 436-37 (7th Cir. 2002) (explaining

that protected conduct under Title VII anti-retaliation provision
is not just any complaint, but a complaint about sex or gender
discrimination); Petersen v. Utah Dep't of Corr., 301 F.3d 1182,
1189 (10th Cir. 2002) (same); Pool v. VanRheen, 297 F.3d 899,
910-11 (9th Cir. 2002) (same); Barber v. CSX Distrib. Servs., 68
F.3d 694, 701-02 (3d Cir. 1995) (making same point in context of
ADEA).

    To be sure, defendant knew that Senator Collins' office was
unhappy about plaintiff's suspension, but plaintiff has produced
no evidence tending to show that Noyes said anything to Dolan
about what Haslam told Senator Collins' staff members regarding
the nature of his complaint.[10]  Thus, plaintiff has produced no
evidence establishing that MVM learned from Noyes that he had
complained to Senator Collins about disability discrimination.
Moreover, plaintiff has produced no evidence that he ever told
MVM, prior to his visit to Senator Collins' office, that he
believed he had been the victim of disability discrimination.  In
other words, plaintiff has failed to show that the USMS or MVM
ever knew that he had engaged in conduct protected under the ADA.

_____

    [10] Moreover, plaintiff himself has testified that he
complained about both the "very, very convoluted system for
determining physical ability to do the [CSO] job," and his belief
that the USMS, and by extension MVM, regarded him as disabled.
That is, he engaged in both protected conduct and conduct that
was not protected by the ADA anti-retaliation provisions.

Nor is there any basis for arguing that MVM should have deduced that plaintiff engaged in protected conduct.  As stated, there is no evidence that plaintiff ever told anyone at the USMS or MVM that he believed he was the victim of disability discrimination. And, all that MVM knew about plaintiff's fitness for CSO duty was that the USMS had determined him medically disqualified for failing to produce requested information; the USMS never determined plaintiff to be medically disqualified due to a medical condition.  So, while it would be reasonable to infer that MVM thought that plaintiff complained to Senator Collins about having to deal with what he perceived to be a bureaucratic run-around, it would not be reasonable to infer that MVM thought that plaintiff complained to Senator Collins about being discriminated against due to an erroneous perception that he was disabled.

The ADA does not protect plaintiff from adverse employment actions undertaken in retaliation for his complaining to Senator Collins; the ADA only protects him from retaliation for complaining to Senator Collins about disability discrimination. Because there is no evidence showing, that the USMS or MVM knew, or had reason to know, that plaintiff complained to Senator Collins about disability discrimination, plaintiff cannot establish a causal connection between his protected conduct and

the adverse employment actions he claims were retaliatory.  Thus, plaintiff has failed to establish a prima facie case of retaliation under the ADA, which entitles defendant to summary judgment on plaintiff's retaliation claim.

## Conclusion

For the reasons given, defendant's motion for summary judgment (document no. 19) is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge,
District of New Hampshire

October 21, 2008

cc:  Brett D. Baber, Esq.
     Jason M. Branciforte, Esq.
     Katherine A. Goetzl, Esq.
     Glenn Israel, Esq.